**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**MATTHEW M. STEVENS,**

                                          **Plaintiff,**

        **vs.**                                                    **6:21-CV-1258**
                                                                   **(MAD/ML)**

**CITY OF ONEONTA,**

                                          **Defendant.**

_____

**APPEARANCES:**                          **OF COUNSEL:**

**MATTHEW M. STEVENS**
391 South America Road
Worcester, New York 12197
Plaintiff, _pro se_

**COUGHLIN, GERHART LAW FIRM**          **ANGELO D. CATALANO, ESQ.**
P.O. Box 2039
99 Corporate Drive
Binghamton, New York 13902
Attorney for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff commenced this action, _pro se_, on November 22, 2021, through the filing of a

complaint.  _See_ Dkt. No. 1.  Plaintiff initially moved to proceed _in forma pauperis_, but later paid

the Court's filing fee.  _See_ Dkt. No. 2.  On December 14, 2021, Plaintiff filed an amended

complaint.  _See_ Dkt. No. 10.  Plaintiff alleges that Defendant City of Oneonta discriminated and

retaliated against him because of his disability and failed to accommodate his disability in

violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, _et seq_.  _See id._  On March

1

30, 2022, Defendant filed a motion to dismiss. *See* Dkt. No. 31. The Court granted the motion in part and denied the motion in part. *See* Dkt. No. 35. The Court dismissed Plaintiff's retaliation claim, but allowed his discrimination and reasonable accommodation claims to proceed. *See id.* Defendant subsequently filed its answer to the amended complaint. *See* Dkt. No. 38. Presently before the Court are Plaintiff's motion for summary judgment, Defendant's cross-motion for summary judgment, and Plaintiff's response. *See* Dkt. Nos. 80, 82, 89.

## II. BACKGROUND

Local Rule 56.1 requires that "[a]ny motion for summary judgment shall contain a separate Statement of Material Facts." N.D.N.Y. L.R. 56.1(a). Plaintiff did not submit a Statement of Material Facts with his motion for summary judgment. *See* Dkt. No. 80. Defendant did submit a Statement of Material Facts with its motion. *See* Dkt. No. 82-27. Plaintiff filed a response to Defendant's Statement of Material Facts, as required by Local Rule 56.1. *See* Dkt. No. 89-1; *see also* N.D.N.Y. L.R. 56.1(b). In a 174-page document, Plaintiff denies every single statement made by Defendant in its Statement of Material Facts. *See* Dkt. No. 89-1. The following factual information is derived from both parties' filings.

**A.    Defendant's Version of the Facts**

Plaintiff began working for Defendant in July 2009 as a Waste Water Treatment Plant Operator ("WWTPO"). *See* Dkt. No. 82-27 at ¶¶ 1-2. Defendant employs five individuals in the Waste Water Treatment Plant. *See id.* at ¶ 42. Defendant employs two Grade 2 WWTPOs, a Senior WWTPO, a Chief WWTPO, and a maintenance worker. *See id.* at ¶¶ 44-45. Plaintiff was a Grade 2 WWTPO. *See id.* at ¶ 41. Defendant asserts that the Maintenance Worker and Chief WWTPO have different duties from the other WWTPOs. *See id.* at ¶ 44.

2

For day-to-day operations, there were often only two WWTPOs in the facility.  *See id.* at ¶ 48.  A WWTPO rotates monthly between three roles: lab technician, process worker, and floater. *See id.* at ¶ 49.  Each WWTPO also has to work one weekend shift by themselves every three weeks.  *See id.* at ¶ 51.  A floater "does [] whatever has to be done throughout the plant meaning maintenance or repair or if the maintenance guy needs any help or the lab guy needs any help that's what the floater does, or the process guy."  *Id.* at ¶ 52 (quotation omitted).  Process work includes "making sure the plant is properly and correctly processing raw sewage through the system without malfunction."  *Id.* at ¶ 53.  Lab work requires "collecting samples from various areas of the plant and checking levels of bacteria and other chemical and natural compounds at each stage of the sewage treatment process."  *Id.* at ¶ 54.

Part of lab work requires the WWTPO to work with hazardous chemicals, including liquid hypochlorite and bisulfate.  *See id.* at ¶¶ 55-56.  "[T]raditionally, the use of those chemicals have necessitated the use of a respirator.  However, due to the liquid form of the chemicals, as used in the lab, the respirator need not be worn at all times."  *Id.* at ¶ 57.  Transferring or refilling the sodium bisulfate requires a respirator.  *See id.* at ¶¶ 70-71.  The floater opens the plant and the lab technician closes the plant.  *See id.* at ¶¶ 59-60.  The WWTPO working on the weekend, as the sole employee on duty, is required to both open and close the plant.  *See id.* at ¶ 62.  Opening and closing duties require the employee to walk the entire plant and ensure that everything is working properly.  *See id.* at ¶ 63.  The process takes approximately one hour to complete.  *See id.* at ¶ 64. There are times when an employee may be the only individual in the building and there are other jobs that require two-to-three people.  *See id.* at ¶¶ 67-69.

Plaintiff contends that he has been diagnosed with sarcoidosis of the heart and lungs.  *See id.* at ¶¶ 3, 84.  Plaintiff also alleges that he was exposed to a chemical at work in November of

2017 that caused a flare up in his sarcoidosis.  *See id.* at ¶¶ 4-5, 87.  Plaintiff reported to work

from 2009 to 2018 without issue, until he suffered a heart attack in 2018.  *See id.* at ¶ 86.  Plaintiff

was removed from work by his treating physician.  *See id.* at ¶ 7.  Plaintiff claims that from 2017

through March 2023, he had shortness of breath and chest pains.  *See id.* at ¶¶ 89-90.

     In May or November 2019, Plaintiff was cleared to return to work following his heart

attack.  *See id.* at ¶ 8.  Plaintiff's physician restricted him from work if he experienced chest pain

or shortness of breath.  *See id.* at ¶ 9.  On January 6, 2020, Plaintiff met with his supervisors to

return to work.  *See id.* at ¶ 10.  Three days later, Plaintiff was forced to leave his job because of

chest pains.  *See id.* at ¶ 11.  He left the plant via ambulance.  *See id.*  Plaintiff was absent from

work from January 9 to January 13, 2020, and January 27 to January 28, 2020.  *See id.* at ¶¶ 12-

13.  Plaintiff again left work due to chest pains on February 2, 2020.  *See id.* at ¶ 14.  Plaintiff

testified that he agreed with his doctor's recommendation that he cannot wear a respirator.  *See id.*

at ¶ 75 (citing Dkt. No. 82-4 at 106-107).  However, Plaintiff testified that the only major life

activity he cannot perform is "strenuous walking" which he defined as continuously walking for

one hour.  Dkt. No. 82-27 at ¶¶ 92-95 (quotation and citations omitted).

     Following Plaintiff's absences, Defendant placed Plaintiff on involuntary medical leave

pursuant to New York Civil Service Law § 72.  *See id.* at ¶ 15.  Defendant ordered Plaintiff to

undergo an independent medical examination to determine his fitness for his job.  *See id.*  Plaintiff

objected to the involuntary leave via a letter on February 12, 2020.  *See id.* at ¶¶ 16-17.

Defendant responded to Plaintiff's letter on February 29, 2020, and informed Plaintiff that he

could not return to work until he was medically cleared by a physician because he created a risk to

himself and others.  *See id.* at ¶ 18.  Plaintiff was evaluated by John J. May, M.D. on March 11,

2020, and was cleared to work, *see id.* at ¶ 19, except "he is NOT approved for use of a respirator. Job activities requiring a  respirator must be deferred to other workers." Dkt. No. 82-13 at 2.

Defendant received Dr. May's letter and determined that Plaintiff was not cleared to perform the essential functions of his job.  *See* Dkt. No. 82-27 at ¶ 20.  Plaintiff requested an appeal hearing, which Defendant granted.  *See id.* at ¶¶ 20-24.  Plaintiff requested an accommodation that would relieve him from "any and all duties which require the use of a respirator and shifting those duties to a different employee."  *Id.* at ¶ 76.  He also sought to be able to leave work when he felt shortness of breath or chest pains.  *See id.* at ¶ 78.  Defendant denied the requests as unreasonable because the WWTPO position required an employee to be able to wear a respirator at any time and shifting duties to other employees was not feasible.  *See id.* at ¶ 79.

An impartial hearing officer, Randy Ray, Esq., determined that Defendant properly placed Plaintiff on an involuntary leave of absence.  *See id.* at ¶¶ 23, 25.  Defendant then rendered a final determination on September 15, 2020, to keep Plaintiff on involuntary leave until he was cleared to return to work.  *See id.* at ¶ 26.  Plaintiff did not appeal the final decision.  *See id.* at ¶ 27.  Defendant notified Plaintiff on August 10, 2021, that because he had been on leave for more than one year, his position would be terminated.  *See id.* at ¶ 28.  Plaintiff appealed the termination letter.  *See id.* at ¶ 30.  Plaintiff submitted letters and met with Defendant to discuss his termination.  *See id.* at ¶¶ 32-34.  Defendant still terminated Plaintiff because of his one year of absence.  *See id.* at ¶ 36.  Plaintiff remained out on leave for thirteen months prior to his termination.  *See id.* at ¶¶ 38-39.

Katie Böttger, Defendant's Personnel Director and Acting Assistant City Manager, testified during her deposition that a respirator is an essential part of a WWTPO's job because the

Occupations Safety and Health Administration ("OSHA") mandates the use of one. *See id.* at ¶ 101. Greg Mattice, Defendant's City Engineer, also testified that a respirator was required to perform the WWTPO's job duties. *See id.* at ¶¶ 106, 109. Ms. Böttger and Mr. Mattice reviewed the materials from Dr. May's evaluation and determined that Plaintiff was not fit to perform his job. *See id.* at ¶¶ 105, 113.[1]

## B.     Plaintiff's Version of the Facts

Although Plaintiff states that he "[d]enies defendant[']s assertions" to every single statement in Defendant's Statement of Material Facts, his commentary is rarely contradictory. Dkt. No. 89-1. Rather, he clarifies certain facts or asserts that such facts support his claim of discrimination.

Plaintiff explains that he was employed by Defendant from July 20, 2009, to August 10, 2021. *See id.* at ¶ 1. Plaintiff states that his physician, Peter J. Jederlinic, M.D., diagnosed him with Stage 1 sarcoidosis of the lungs in 2009. *See id.* at ¶¶ 2-3. Plaintiff asserts that Randolph Hutter, M.D., "found the 'Cardiac/Heart Sarcoid in (2018) only months after the 'Exposure' on City Property by Co-worker, Jason Bouton on 11/15/17." *Id.* at ¶ 3. Plaintiff contends that he was exposed to "3M Undercoating Chemical" which was not allowed on company property. *Id.* at ¶ 4.

Plaintiff agrees that he suffered a heart attack in October 2018, but notes that he "went to a Pulmonary check-up and the pulmonary physician sent [Plaintiff] to 'immediately' see Dr. Hutter (Cardiology) in the same Bassett Hospital." *Id.* at ¶ 7. "Dr. Hutter . . . did not remove [Plaintiff] from 'Work' as" Defendant contends. *Id.* In May 2019, Plaintiff was given a doctor's note from

---

[1] Although not included in Defendant's statement of material facts, Plaintiff testified that he filed two claims with the EEOC and two claims with the Division of Human Rights. *See* Dkt. No. 82-4 at 200. The EEOC and the Division of Human Rights dismissed Plaintiff's claims. *See id.* at 201.

Dr. Peipei Zhou.  *See id.* at ¶ 8; *see also* Dkt. No. 82-5 at 23.  Plaintiff presented the note to Ms.

Böttger, but she "refused the proposed 'accommodation' . . . .  She then told [Plaintiff] to return to

Dr. Zhou's office in Oneonta to have Dr. Zhou change the Note to say 'No Restrictions.'"  Dkt.

No. 89-1 at ¶ 8.  Dr. Zhou said it "was an unreasonable request and (he) was not changing the

note."  *Id.*

       Plaintiff states that on January 9, 2023, he was not "forced to leave" work because of his

chest pain, but he "requested to the go to the Hospital."  *Id.* at ¶ 11.  He also contends that he was

not out of work from January 9 to 13, 2023, because of chest pains and a hospital visit, but

because of an upper respiratory infection.  *See id.* at ¶ 12.  Likewise, Plaintiff asserts that he was

not "forced to leave work, on February 2, 2022, due to chest pain," but he left work for a doctor's

appointment because "[r]emember that Sarcoidosis weakens the 'Major Life Activity' – Immune

System."  *Id.* at ¶ 14.

       Plaintiff objects to Defendant's reliance on its February 29, 2020, letter which stated his

medical issues created a risk to himself and others because "[t]he Chemical Transfers 'Do not

Happen' except April to October.  This letter was in February a 'Non-Chlorination' Season."  *Id.* at

¶ 18.  He states that the "[t]he time required for one transfer is only (15-20 minutes) twice a

month during the Chlorination season (April to October).  This equals less than six hours a year. .

. . This task can be given to another operator during these six months."  *Id.* at ¶ 47.

       Plaintiff states that he was hired by Defendant as a "Trainee," which is a Grade 1 position.

*Id.* at ¶ 41.  He states that he "has a Grade 3 Certification from NYWEA and NYSDEC."  *Id.*

Plaintiff deems himself "an 'Expert Witness.'"  *Id.*  Plaintiff contends that there are "(Not just) five

individuals as stated by the City of Oneonta" because "there is a Chief Operator – Grade 4

Certification, Senior Operator – Grade 3 or 4 Certification, two Operators either Grade 2, 3, or 4,

and a Maintenance Person.  There are four operators and one maintenance." *Id.* at ¶ 42.  Plaintiff

disagrees that there were only two WWTPOs often working at a time, and states that "[t]he day-

to-day was operators and one maintenance person." *Id.* at ¶ 48.  Plaintiff states that the chemical

transfer process requires two employees, so it is "[n]ot an Unreasonable Accommodation or an

Undue Hardship" for him to miss work. *Id.* at ¶ 43.

Plaintiff denies Defendant's assertion that the Chief Operator and Senior Operator have

different tasks because "[t]he Chief can still help throughout the plant processes if the need arises.

The Maintenance personnel is supposed to participate in daily, weekly, and monthly tasks – Like

chemical transfers." *Id.* at ¶ 44.  Additionally, the "Senior operator performs all of the same daily,

weekly, [and] monthly tasks as all of the other operators." *Id.* at ¶ 45.

As to Defendant's assertion that there was only one employee working on the weekends,

Plaintiff explains that "[t]he weekend shifts are only four hours on Saturdays and Sundays." *Id.* at

¶ 51.  He states that "[t]he weekend shift Saturday consists of the following[:] an opening rounds

of one hour, then one hour of lab work and office paperwork.  One hour to sweep the main office,

lab room, hallways, conference/lunch room, and the locker room.  Lastly, one hour to perform

closing rounds." *Id.*  Plaintiff contends that "Sunday is the same, except instead of sweeping – the

operator mops the aforementioned rooms and areas." *Id.*  He asserts that "[t]he Operator can call-

in assistance from other operators if it is necessary." *Id.*  Plaintiff states that "[t]he Opening

Rounds have many more steps" than those identified by Defendant. *Id.* at ¶ 63.  He states that

opening takes between forty-to-sixty minutes to complete. *See id.* at ¶ 64.

Plaintiff denies Defendant's assertions as to the specific jobs completed by the floater and

operator but merely adds additional jobs such as the floater checking the generator and

completing weekly record sheets.  *See id.* at ¶ 52.  He explains that the operator "pump[s] Floc

and Final pits, check[s] the Thickener, Belt Pressing, perform[s] Recirculation of Hot Sludge, and

run[s] other daily Process tasks."  *Id.* at ¶ 53.  The lab work consists of running numerous tests

and maintaining data and reports on those tests.  *See id.* at ¶ 54.  Plaintiff denies that any

WWTPO touches or handles hazardous chemicals.  *See id.* at ¶¶ 55-57, 60.  Plaintiff asserts that

"[t]he daily tasks of Process work or any work is 'not always' alone.  When an operator works on a

task there are other operators and maintenance workers that periodically enter these same working

areas, as the processes are being completed."  *Id.* at ¶ 67.  Plaintiff notes that "[l]ike most jobs, an

operator, will be in a room for short periods of time by themselves."  *Id.*

As to Defendant's allegation that Plaintiff sought an accommodation from any and all

duties requiring the use of a respirator, Plaintiff notes that "those chemical transfers onl[y] take

(15-20 minutes)."  *Id.* at ¶ 76.  Plaintiff argues that Defendant's attorney "refused to hear any other

options to the 'Major Life Activities'" besides the strenuous walking.  *Id.* at ¶ 92.  He asserts that

Ms. Böttger was not employed during the period that Plaintiff "returned to work on 1/6/20."  *Id.* at

¶ 97.  Plaintiff also contends that at the end of his fitness for duty examination, the doctor told

him that "he is OK for return to customary activities at work."  *Id.* at ¶ 103.  Plaintiff disagrees

that Mr. Mattice was familiar with the WWTPOs' job duties because he "didn't follow daily

operations or know what happened ate [sic] the WWTP."  *Id.* at ¶ 108.

Throughout his response, Plaintiff repeats that the issues concerning the respirator and the

requirement to wear one are "'irrelevant' based on the (ADA) as Matthew Stevens has continued

to 'state' in this document.  The (facts) haven't changed (action/Respirator) is 'illegal.'"  *Id.* at

¶ 111.  Plaintiff contends that "[t]he following terms/words are 'illegal'[:] essential function and

required."  *Id.*  He asserts that a respirator is not included in his job description.  *See id.*  Plaintiff

also repeatedly references a "Healed 100% Policy" which he asserts violates the ADA and was used by Ms. Böttger to keep plaintiff out of work.  *Id.* at ¶¶ 19, 25, 73, 77.

## III. DISCUSSION

**A.    Evidentiary Issues**

### 1. Deposition Objections

Throughout Plaintiff's response to Defendant's cross-motion for summary judgment, Plaintiff argues that his deposition violated Federal Rule of Civil Procedure 30 and Federal Rule of Evidence 611.  He argues that Defendant's attorney improperly asked him leading questions. *See* Dkt. No. 89-7 at 16-17.

Rule 611 states that "[l]eading questions should not be used on direct examination except as necessary to develop the witness's testimony.  Ordinarily, the court should allow leading questions: (1) on cross-examination; and (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party."  FED. R. EVID. 611(c).  Rule 30 of the Federal Rules of Civil Procedure provides as follows:

> At any time during a deposition, the deponent or a party may move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party.  The motion may be filed in the court where the action is pending or the deposition is being taken. If the objecting deponent or party so demands, the deposition must be suspended for the time necessary to obtain an order.

FED. R. CIV. P. 30(d)(3)(A).

Plaintiff is an adverse party to Defendant.  Plaintiff did not object during his deposition. *See* Dkt. No. 82-4.  Plaintiff did not move to terminate his deposition pursuant to Rule 30.  Thus, there is no merit to Plaintiff's contentions regarding his deposition.  *See Jean v. Acme Bus Corp.*, No. 08-CV-4885, 2012 WL 4171226, *6 (E.D.N.Y. Sept. 19, 2012) ("Plaintiff commenced this

action p*ro se* . . . 'representing himself, and as such, [wa]s duty-bound to participate in all phases of the litigation, including, as requested, presenting himself as a witness to be deposed.' . . . Defense counsel had the right to depose plaintiff and inquire into the factual basis for his discrimination claims and thereby conduct discovery"); *Gugino v. City of Buffalo*, No. 21-CV-283, 2024 WL 2785505, *6 (W.D.N.Y. May 30, 2024) ("Fed. R. Evid. 611(c)(2) specifically permits leading questions to be asked of, *inter alia*, an adverse party.  Accordingly, in deposing Gramaglia who, as a defendant to this action, is an adverse party, Plaintiff is permitted to ask leading questions thereby requiring a yes or no response").

## 2.  *Audio Recordings*

Plaintiff submitted audio files with his response to Defendant's cross-motion for summary judgment and the Court has reviewed them all.  In Plaintiff's response, he includes quotations from the audio recordings.  *See* Dkt. No. 89-3 at 51-85.  From the Court's review, the recordings reflect statements from Ms. Böttger, Plaintiff, and Chris Pelligra, the Chief WWTPO discussing Plaintiff's ability to return to work.  Plaintiff's descriptions of the statements correlate to what the Court hears in the recordings.  *See id.*  The Court permitted Defendant to submit a sur-reply on the issue of the recordings.  *See* Dkt. No. 94.  Defendant argues that the recordings lack foundation and are inadmissible.  *See* Dkt. No. 95.

Although Plaintiff commenced this action *pro se* and has continued to litigate this action without counsel, his *pro se* status does not excuse him from complying with the requirement set forth in Federal Rule of Civil Procedure 56 that he must present evidence to the Court in an admissible form.  *See* FED. R. CIV. P. 56(c); *see also Quinones v. City of New York*, No. 16-CV-00985, 2019 WL 6736784, *5 (S.D.N.Y. July 18, 2019) ("[A] *pro se* plaintiff, like any other party, must come forward with evidence in admissible form that is capable of refuting those

facts"); *Carter v. Fresenius Kabi USA, LLC.*, No. 19-CV-01183, 2022 WL 2757726, *7 (W.D.N.Y. Jan. 12, 2022) ("Carter's '*pro se* status does not excuse him from taking necessary discovery in a timely manner and responding to summary judgment with admissible evidence'") (quoting *Tramble v. Columbia Univ.*, 1999 WL 61826, *13 (S.D.N.Y. 1999)); *Bryant v. Whitmore*, No. 9:14-CV-1042, 2016 WL 7188127, *3 (N.D.N.Y. Nov. 4, 2016) ("In deference to Plaintiff's *pro se* status, the Court has opted to review the entire record in this case. . . .  However, the Court's review has revealed that Plaintiff's submissions contain very little in the way of admissible evidence").

The Court has reviewed the entire record including all of Plaintiff's submissions.  This includes the audio recordings.  Plaintiff has not submitted a sworn affidavit attesting to the authenticity of any of his submitted evidence.  "'To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.'"  *United States Equal Emp. Opportunity Comm'n v. McLane/E., Inc.*, No. 5:20-CV-1628, 2023 WL 7701707, *1 (N.D.N.Y. Nov. 15, 2023) (quoting FED. R. EVID. 901(a)).  "Authentication under Rule 901 'does not erect a particularly high hurdle,' . . . and may be accomplished with testimony of a witness with knowledge 'that an item is what it is claimed to be[.]'"  *Id.* (quoting *SCS Commc'ns, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 344 (2d Cir. 2004); FED. R. EVID. 901(b)(1)).  At the end of Plaintiff's summary judgment memorandum of law and response memorandum of law, there is the signature of a notary public as well as Plaintiff's signature.  *See* Dkt. No. 80 at 24; *see also* Dkt. No. 89-7 at 19.  However, there are no statements attesting to the authenticity or veracity of any of the contentions or exhibits that Plaintiff presents.  Much of the evidence is also inadmissible.

As to the audio recordings, the statements purportedly made by Plaintiff, Ms. Böttger, and Mr. Pelligra are statements that were made out of Court and are being submitted by Plaintiff to prove the truth of those statements.  Such statements are hearsay.  *See United States v. Reyes*, 18 F.3d 65, 69 (2d Cir. 1994) ("Hearsay is evidence of a declarant's out-of-court statement to prove the truth of what is asserted in the statement"); *United States v. Reynolds*, 715 F.2d 99, 103 (3d Cir. 1983) ("[S]tatements containing express assertions may also contain implied assertions qualifying as hearsay and susceptible to hearsay objections").

"Statements that are inadmissible hearsay cannot be relied upon to defeat summary judgment."  *Ruffin v. Kirschenbaum & Phillips P.C.*, No. 20-CV-05422, 2022 WL 704943, *4 (S.D.N.Y. Mar. 9, 2022) (citing FED. R. CIV. P. 56(c); *Whidbee v. Garzarelli Food Specialties*, Inc., 223 F.3d 62, 71 (2d Cir. 2000); *Rodriguez v. Nassau Cnty.*, No. 16-CV-2648, 2019 WL 4674766, *11 (E.D.N.Y. Sep. 25, 2019), *aff'd sub nom. Rodriguez v. Cnty. of Nassau*, 830 Fed. Appx. 335 (2d Cir. 2020)).  "If evidence such as transcript or audio recordings submitted at summary judgment are unauthenticated and not supported by an affidavit, it is inadmissible."  *Id.* (citing *Rivera v. Choice Courier Sys., Inc.*, No. 01-CV-2096, 2004 WL 1444852, *6 (S.D.N.Y. June 25, 2004)) (additional citations omitted); *see also Soumekh v. LD Consulting Servs., Inc.*, No. 18-CV-6337, 2022 WL 20652789, *5 (E.D.N.Y. Aug. 10, 2022).  "Audio recordings can be authenticated by someone with personal knowledge present during the taping, among other ways."  *Id.* (citing FED. R. EVID. 901(b)(1)).

Plaintiff has in no way authenticated the audio files that he submitted to the Court. Plaintiff's written excerpts are also hearsay and Plaintiff does not argue any exceptions to the general exclusion of hearsay statements.  However, the statements would potentially be admissible as statements made by a party opponent pursuant to Federal Rule of Evidence

801(d)(2)(D) which allows for statements "offered against an opposing party and . . . made by the party's agent or employee on a matter within the scope of that relationship and while it existed." FED. R. EVID. 801(d)(2)(D).  Courts have considered "materials that would themselves be admissible at trial, and the content or substance of otherwise inadmissible materials where the 'the party submitting the evidence show[s] that it will be possible to put the information . . . into an admissible form.'" *Singletary v. King Crab Boiling Seafood & Bar, Inc.*, No. 3:22-CV-1591, 2023 WL 11267694, *7 (D.S.C. Nov. 17, 2023) (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015), *as amended* (June 24, 2015)).

During Plaintiff's deposition, Defendant's counsel asked about the audio recordings.  See Dkt. No. 82-4 at 204.  Plaintiff confirmed that he had several recorded conversations between himself and Defendant.  *See id.*  Counsel asked Plaintiff whether he "only record[ed] certain conversations with the city or . . . every conversation you have?"  *Id.* at 205.  Plaintiff stated that he "recorded everything."  *Id.*  However, he "didn't keep them . . . [b]ecause they didn't prove anything."  *Id.*  Plaintiff explained hat he had a hand-held recorder in his shirt pocket which he used every day from November 2017 until February 2020.  *See id.* at 206-11.  He deleted the recordings that "were useless."  *Id.* at 215.  He said he "deleted them every day."  *Id.* at 218.  He was asked whether he "only saved the conversations that were beneficial to [him] in [his] lawsuit."  *Id.* at 209.  He responded, "Yes."  *Id.*  He also confirmed that he deleted every other conversation he recorded since 2017.  *See id.*

Defendant argues that because the recordings are incomplete, they violate Rule 106 of the Federal Rules of Evidence.  *See* Dkt. No. 95 at 2.  "Once a party produces all or part of a recorded statement, 'an adverse party may require the introduction, at that time, of any other part -- or any . . . recorded statement -- that in fairness ought to be considered at the same time.'"  *United States*

*v. Campos*, 763 Fed. Appx. 97, 101 (2d Cir. 2019) (quoting FED. R. EVID. 106).  Defendant does not and would not have the opportunity to introduce any other recording because Plaintiff saved only those which he thought "prove[d]" part of his case.  Dkt. No. 82-4 at 205.  Additionally, as Defendant states, the recordings reflect statements made outside of the applicable time period. *See* Dkt. No. 95 at 2.  In a Memorandum-Decision and Order dated November 1, 2022, this Court concluded that "any alleged acts of discrimination prior to March 14, 2020, are time-barred." Dkt. No. 35 at 9.  Plaintiff contends that his recordings are from February 23, 2018, and January 6, 2020.  *See* Dkt. No. 89-3 at 51, 53.  Although Plaintiff states that "time frame – doesn't matter," the Court has already expressly explained otherwise.  *Id.* at 51; *see also* Dkt. No. 35 at 8.

Plaintiff has not authenticated the recordings, presented any arguments concerning their admissibility, nor provided Defendant or the Court with every recording he ever made.  Although the Court has considered the submitted recordings because of Plaintiff's *pro se* status, the Court concludes that they are insufficient to raise a question of fact as to any of Plaintiff's claims because of the numerous deficiencies outline in this Memorandum-Decision and Order.

### 3. Habit Evidence

Plaintiff also cites Federal Rule of evidence 406, which allows the use of evidence showing habit or routine practice.  *See* Dkt. No. 89-7 at 18.  Plaintiff then references the alleged statements made by Ms. Böttger that the City has a "past practice of no light duty" and by Mr. Pelligra that "you are not allowed to work in this position with any restrictions."  *Id.*

Rule 406 states as follows: "Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice.  The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness."  FED. R. EVID. 406

"'In order to be admissible under this rule . . . the conduct at issue must constitute a regular response to a repeated specific situation.'" *Pena v. Macy's Inc.*, No. 22-CV-09435, 2024 WL 1833880, *1 (S.D.N.Y. Apr. 26, 2024) (quoting *McCarrick v. New York City Off-Track Betting Corp.*, No. 91-CV-05626, 1995 WL 261516, *5 (S.D.N.Y. May 3, 1995)). "'While evidence of specific employer practices may constitute admissible habit evidence, evidence of an employer's overall policy of discrimination against several individuals under varying circumstances is not the sort of repeated conduct covered by Rule 406.'" *Id.* (quotation omitted). "A party offering evidence of habit 'must establish the degree of specificity and frequency of uniform response that ensures more than a mere "tendency" to act in a given manner, but rather, conduct that is "semi-automatic" in nature.'" *Id.* (quoting *Zubulake v. UBS Warburg LLC*, 382 F. Supp. 2d 536, 542 (S.D.N.Y. 2005)). "'It is only when examples offered to establish such a pattern of conduct or habit are numerous enough to base an inference of systematic conduct, that examples are admissible.'" *Id.* (quotation omitted); *see also LeClair v. Raymond*, No. 1:19-CV-28, 2022 WL 219609, *5 (N.D.N.Y. Jan. 25, 2022) (quoting *Batoh v. McNeil-PPC, Inc.*, 167 F. Supp. 3d 296, 309 (D. Conn. 2016)).

Plaintiff's submitted audio recordings and typed iterations of statements reflect that Ms. Böttger allegedly said the "City has a long standing past practice of no light duty.  So either you have to be able to come to work and function at 100% or you can't return to work at all."  Dkt. No. 89-7 at 18 (cleaned up); *see also* Dkt. No. 89-1 at ¶ 105.  Plaintiff also asserts and provides a recording of Mr. Pelligra's statement that, "[h]ere you are not allowed to work in this position with any restrictions[.]"  Dkt. No. 89-7 at 18.

Although Plaintiff's recordings allude to the City's practice concerning reasonable accommodations, it is not admissible evidence.  Plaintiff has not presented a semi-automatic

pattern that has occurred on numerous occasions.  Therefore, the information it is not habit evidence under Rule 406.

### 4.  *Expert Witness*

Throughout Plaintiff's response to Defendant's cross-motion for summary judgment, Plaintiff refers to himself as an "expert witness."  Dkt. No. 89-1 at 79.

"Federal Rule of Evidence 702 governs the admissibility of expert testimony."  *Krause v. CSX Transp.*, 984 F. Supp. 2d 62, 73 (N.D.N.Y. 2013).  Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.  "[T]he trial judge stands as a 'gatekeeper,' charged with determining whether the proffered testimony satisfies a number of standards, including, among other things, that 'the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.'"  *Krause*, 984 F. Supp. 2d at 74 (quoting *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013)) (additional quotation omitted).

"[T]he proposed expert must be 'qualified' to give the proffered opinion." *Id.* (quoting *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589-90, 597 & nn. 7, 10 (1993)).  "'To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony.'" *Id.* (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)).  "The party offering the testimony has the burden of establishing its admissibility by a preponderance of the evidence." *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 411 (S.D.N.Y. 2016).

Plaintiff does not present any grounds upon which the Court could qualify him as an expert under Federal Rule of Evidence 702.  He refers to himself as an "Expert Witness" in the context of the work his job requires. Dkt. No. 89-1 at ¶¶ 42-43, 62.  He created pie charts dividing the job requirements.  *See* Dkt. No. 82-20 at 11-13.  Plaintiff stated that he is certified as a Grade 3 operator.  *See* Dkt. No. 89-1 at ¶ 43.  He can testify to his job responsibilities, but that does not qualify him as an expert witness.  One cannot simply declare that they are an expert in a subject matter.  Thus, the Court will not consider Plaintiff to be an expert witness and his statements and contentions will be given no special weight or consideration.

**B.    Summary Judgment Standard**

"The entry of summary judgment is warranted when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Doane v. United States*, 369 F. Supp. 3d 422, 438 (N.D.N.Y. 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also* FED. R. CIV. P. 56(a).  "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"

*Jennings v. Decker*, 359 F. Supp. 3d 196, 204 (N.D.N.Y. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Doane*, 369 F. Supp. 3d at 438; *Kenney v. Clay*, 172 F. Supp. 3d 628, 635 (N.D.N.Y. 2016).

"'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)). However, irrelevant or unnecessary factual disputes do not preclude summary judgment. *See Anderson*, 477 U.S. at 248. Only genuine disputes about a material fact, such that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" will preclude summary judgment. *Id.*

The party moving for summary judgment "bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim." *Doane*, 369 F. Supp. 3d at 438. If the moving party establishes a prima facie basis for summary judgment and satisfies their burden, the burden then shifts to the nonmoving party, who must then "show, through affidavits or otherwise, that there is a material issue of fact for trial" that a reasonable jury could resolve in its favor. *Id.*; *see also Kenny*, 172 F. Supp. 3d at 635. Evidence that is not significantly probative, or "the mere existence of some alleged factual dispute between the parties[,] will not defeat an otherwise properly supported motion for summary judgment." *Kenny*, 172 F. Supp. 3d at 635-36 (quoting *Anderson*, 477 U.S. at 247-48); *see also Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) ("Genuine issues of fact are not created by conclusory allegations"). The nonmoving party must show by more than a "scintilla of evidence" that "a fact-finder could reasonably find for the non-movant." *Heublein*, 996 F.2d at 1461. In determining the existence of any genuine disputes of material fact, "a court

must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party." *Smith v. N.Y.S. Off. of Temp. & Disability Assistance*, 535 F. Supp. 3d 90, 94 (N.D.N.Y. 2021) (quoting *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017)); *see also Jeffreys*, 426 F.3d at 553.

"'Where, as here, the parties have cross-moved for summary judgment, a reviewing court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Goodall v. New York State Dep't of Corr. & Cmty. Supervision*, No. 9:19-CV-1359, 2024 WL 1288511, *9 (N.D.N.Y. Mar. 26, 2024) (quoting *United States v. Bedi*, 453 F. Supp. 3d 563, 570 (N.D.N.Y. 2020), *rev'd and remanded on other grounds by United States v. Bedi*, 15 F.4th 222 (2d Cir. 2021)). "'In undertaking this analysis, it bears noting that a district court is not required to grant judgment as a matter of law for one side or the other.'" *Id.* (quotation omitted).

Courts must afford *pro se* plaintiffs "special solicitude" before granting a motion for summary judgment. *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994). "A document filed *pro se* is 'to be liberally construed,' . . . and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "This policy of liberally construing *pro se* submissions is driven by the understanding that implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (internal quotations and modifications omitted). Therefore, courts read *pro se* filings "to raise the strongest arguments that they suggest." *Id.* at 474.

**C.      Prime Facie ADA Claim**

"Title I of the ADA prohibits discrimination 'against a qualified individual on the basis of disability in regard to . . . employee compensation . . . and other terms, conditions, and privileges of employment.'" *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 234-35 (2d Cir. 2015) (quoting 42 U.S.C. § 12112(a)).  The elements of an ADA discrimination claim are as follows:

> (1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability.

*Id.* (citing *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008)).  "Under the last element, a plaintiff must show that the adverse employment action 'took place under circumstances giving rise to an inference of discrimination.'"  *Id.* (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).  In reasonable accommodation cases, the plaintiff must demonstrate the following factors:

> "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."

*Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006) (quoting *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)).

"Claims alleging discrimination under the ADA are subject to the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Id.* (citing *McBride v. BIC Consumer Products Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009)).  "Under that framework, once a plaintiff produces minimal evidentiary support for the claim of discriminatory motivation, the

burden of production shifts to the employer to articulate a non-discriminatory reason for the adverse employment action." *Id.* "But once the employer has set forth its non-discriminatory justification, the plaintiff must then produce evidence capable of carrying the burden of persuasion that the employer's action was at least in part motivated by discrimination." *Id.* (citations omitted).

### 1. *Whether Plaintiff Has a Disability*

A "disability" is defined as follows: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). "The existence of a disability must be determined on a 'case-by-case' basis." *Capobianco v. City of New York*, 422 F.3d 47, 56-57 (2d Cir. 2005) (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002)). "Not every impairment is a 'disability' within the meaning of the ADA; rather, there are two requirements: the impairment must limit a major life activity and the limitation must be substantial." *Id.* (quoting 42 U.S.C. § 12102(1)(A)).

"'[M]ajor life activities' are 'activities that are of central importance to daily life.'" *Id.* (quoting *Toyota*, 534 U.S. at 197). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "[A] major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 12102(2)(B); *see also* 29 C.F.R. § 1630.2(i)(1).

"The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.  'Substantially limits' is not meant to be a demanding standard."  29 C.F.R. § 1630.2(j)(i).  "An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  *Id.* § 1630.2(j)(ii).  "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  *Id.*; *see also Toyota*, 534 U.S. at 196-97 (quotation omitted) ("'[S]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree,' and 'thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities'").  "Moreover, the mere fact that an impairment requires an individual to perform a task differently from the average person does not mean that she is disabled within the meaning of the ADA; rather, there must be a significant restriction."  *Capobianco*, 422 F.3d at 57.

During his deposition, Plaintiff was asked if he had any impairments that substantially limit his major life activities.  *See* Dkt. No. 82-4 at 153.  He stated that his sarcoidosis of the heart and lungs limits his eating.  *See id.*  Plaintiff testified that he must wait before eating breakfast because of chest pain and if he eats, he will throw up.  *See id.*  He explained that no doctor instructed him to wait to eat, but that he does it himself to avoid throwing up.  *See id.* at 153-54.  Plaintiff affirmed that he can eat breakfast, he just does not do so within the first two hours of waking up.  *See id.* at 154.

Plaintiff also discussed issues breathing.  *See id.*  He asserted that he had lower oxygen capacity and constant chest pain, coughing, and wheezing.  *See id.*  Plaintiff testified that he had

chest pain and coughing since November 15, 2017 "when [he] got exposed," and he had the wheezing "since as long as [he has] had the sarcoid." *Id.* at 154-55.

Defendant's counsel asked what "life activity" is limited by his sarcoidosis and Plaintiff said "extreneous [sic] walking is a perfect example." *Id.* at 155. He testified that "walking for an hour, that's extrenuous [sic]." *Id.* Counsel then inquired, "[a]ny other activity, major life activity you can't do because of your lower oxygen levels?" *Id.* at 157. Plaintiff responded, "Nope. That's pretty much it." *Id.* Counsel followed up, asking, "You can do everything else that you would normally do?" *Id.* Plaintiff testified, "Yes. That's why, yep." *Id.* The following exchange occurred:

> Q. I'm sorry. I don't mean to repeat myself, but I want to make sure I understand this correctly. The only life activity that you are limited right now is the inability for strenuous walking which you would say an hour straight of walking, correct?
>
> A. Yes.
>
> Q. Every other activity of daily living you have no issue with whatsoever?
>
> A. Right.
>
> Q. And that change to your inability to do strenuous walking was in 2017?
>
> A. Yes.
>
> Q. Has it gotten better or worse since 2017?
>
> A. It's about the same.

*Id.* Defendant's counsel proceeded to ask about Plaintiff's ability to walk in terms of his job. Plaintiff defined strenuous walking as "if you walked from the main building to the floc pit back to the digester back to the floc pit back to the main building that's what I would call extrenuous

because you're nonstop walking." *Id.* at 158.  Counsel asked, "[s]o is it your testimony that you can't be on your feet walking around the plant for an hour straight?" *Id.*  Plaintiff stated, "For extrenuous, yeah, walking." *Id.*

Counsel also asked, "how often, if ever" Plaintiff had "to walk for an hour straight while at work." *Id.* at 159.  Plaintiff said, "Maybe half a dozen times." *Id.*  Defendant's counsel asked for clarification as to whether Plaintiff meant "[h]alf a dozen times a day, a year, a month?" *Id.*  Plaintiff testified, "No.  In a week I'd say." *Id.*  Plaintiff testified that he "can do it," "it's just hard to do." *Id.* at 160.  Defendant's counsel asked, again, twice, whether Plaintiff could walk for one hour straight. *See id.*  Plaintiff stated that he "cannot." *Id.*  Counsel then asked, "[a]nd six times a week while at work at the wastewater treatment plant you have to be able to walk for an hour straight?" *Id.* at 161.  Plaintiff said, "Yes." *Id.*

Plaintiff stated that walking for one hour is not an essential part of his job because it is not all of the time. *See id.* at 161.  He explained, "[i]t's not essential because you do process work and full work and laboratory work.  That's on top of it.  That's like if you have to run back and forth to gather tools and parts or whatever." *Id.*  He admitted, however, that gathering tools and parts is essential to his job. *See id.* at 161-62.  Plaintiff explained, "Breathing, I can still function.  I can still do the job, but it's hard to breathe sometimes.  That's what I was trying to get at." *Id.* at 162.

Defendant's attorney again asked, "On average you need to be able to do an hour of walking six times a week to do your job as a wastewater treatment plant operator?" *Id.* at 162-63.  Plaintiff said, "Yes," to which Counsel asked, "So on an average week you can't perform the duties of your job at least six times in a week?" *Id.* at 163.  Plaintiff responded, "But I still did." *Id.*

Plaintiff's *pro se* motion for summary judgment notes that "major life activity" includes "Immune support, Respiratory and Circulatory" and an impairment that is episodic or in remission.  Dkt. No. 80 at 1-2.  He reiterates that he "has Sarcoidosis of the Heart and Lungs."  *Id.* at 2.  Plaintiff argues that "[u]nder the (ADA), Sarcoidosis of the Heart and Lungs is a 'Disability.'"  *Id.* at 5.

Having a diagnosed disability does not automatically equate to having a "disability" as defined under the ADA.  *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 185 (2002), *overturned due to legislative action on other grounds* (2009) ("It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment"); *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998) ("Although almost any impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired person to be disabled"); *Lopez v. City of Albany*, No. 1:19-CV-1072, 2019 WL 7944411, *3 (N.D.N.Y. Oct. 9, 2019) (quoting *Robinson v. Purcell Const. Corp.*, 859 F. Supp. 2d 245, 259 (N.D.N.Y. 2012) ("'[T]he determination of whether or not a person suffers from a disability under the ADA is an individualized inquiry that does not rest on the mere diagnosis of an impairment'").

Based on the record before the Court, Plaintiff is not disabled under the definition set forth in the ADA.  A medical record dated April 22, 2011, from Dr. Jederlinic at Bassett Healthcare Network assessing Plaintiff's Stage 1 sarcoidosis.  *See* Dkt. No. 89-3 at 4.  It states that Plaintiff was "Asymptomatic.  He will have chest x-ray on departure today.  Lung function is improved. He also had an incidental caustic inhalation prior to the time I first saw him and appears to have recovered from that."  *Id.*

On November 27, 2018, Plaintiff was examined in conjunction with a workers' compensation claim and his self-reported chemical exposure on November 14, 2017.  *See* Dkt. No. 89-3 at 6-7.  The provider noted that Plaintiff could not return to work "until further notice" and diagnosed him with "dyspnea on exertion, essential hypertension, cardiac sarcoidosis, ongoing pain radiate[s down] arm [at] times." *Id.* at 7.  On December 13, 2019, in a "Return to Work Evaluation Report," Plaintiff's sarcoidosis was noted, but the provider indicated that Plaintiff was "asymptomatic."  Dkt. No. 89-3 at 11.  Kathleen Henderson, PA concluded that Plaintiff "may return to work regular duty.  Advised to cease activity with any symptoms such as chest pain or [shortness of breath]." *Id.*   Her note also indicates that Plaintiff is released to return to work as "regular duty" but that he has restrictions as follows: "[i]f patient develops chest pain, [shortness of breath] he should cease activity and seek evaluation."  Dkt. No. 89-4 at 53.  Plaintiff also presents a record from Albany Medical Center dated May 16, 2019, which notes that Plaintiff can return to work "any time" but that there should be "no heavy lifting/strenuous activity at first, then can increase as tolerated."  Dkt. No. 89-4 at 48.  Another note from Albany Medical Center dated February 19, 2020, indicates that Plaintiff can return to work on February 24, 2020, with no restrictions.  *See id.* at 51.

There is nothing in any of the records provided by Plaintiff that indicates that his sarcoidosis limits a major life activity.  The only evidence concerning whether Plaintiff has a disability that limits a major life activity is his deposition testimony that he was limited in his ability to walk for one hour.  *See* Dkt. No. 82-4 at 155.  However, he repeatedly contradicts himself in his deposition, stating both that he can and cannot walk continuously for one hour.  *See id.* at 158-63.  As to this contradiction, Plaintiff argues that Defendant's attorney "repeatedly used 'Argumentative' And 'Leading the Witness' tactics to procure (His) wanted answers."  Dkt. No.

89-1 at ¶ 95.  Plaintiff argues that his deposition was taken improperly because of the "'illegal' style questions."  *Id.*  Plaintiff also states that the contention about him contradicting himself "is 'irrelevant' and 'mute' based on the section of the (ADA) labeled – 'Qualified Individual.'  The City of Oneonta 'cannot' enforce the (Action/Respirator) or the violation words/terms as follows 'essential function' or 'required.'  These terms/words (Respirator) have to be in the City of Oneonta Grade 2 WWTP Operator job description – Which it is 'Not.'"  *Id.*

Insofar as Plaintiff discusses his job description and Defendant's argument that a respirator was required, the Court will address that issue in the next section of this Memorandum-Decision and Order.  Plaintiff's arguments do not provide any information about a major life activity that is limited by any medical condition.  *See Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002) (citations omitted) ("[P]laintiff must first show that she suffers from a physical or mental impairment. . . .  Second, plaintiff must identify the activity claimed to be impaired and establish that it constitutes a 'major life activity.' . . .  Third, the plaintiff must show that her impairment 'substantially limits' the major life activity previously identified. . . .  In addition, the Supreme Court has recently clarified that the identified major life activity must be 'of central importance to daily life'").  Plaintiff's failure to present evidence concerning a major life activity that is substantially limited and central to his daily life is detrimental to his claim because "a plaintiff who seeks to show that he is disabled within the meaning of the ADA must do more than 'merely submit evidence of a medical diagnosis of an impairment.'"  *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 305 (S.D.N.Y. 2003) (quotation omitted); *see also Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004) ("A plaintiff suing for disability discrimination under the ADA bears the initial burden of establishing a *prima facie* case").

To be sure, administrative regulations interpreting the ADA provide guidance addressing whether an impairment substantially limits a major life activity, stating, for example, that "the condition or manner under which someone with coronary artery disease performs the major life activity of walking would be substantially limiting if the individual experiences shortness of breath and fatigue when walking distances that most people could walk without experiencing such effects." *Interpretive Guidance on Title I of the ADA*, 29 C.F.R. Pt. 1630, App. § 1630(j)(4) (July 5, 2004).  Likewise, "a person whose back or leg impairment precludes him or her from standing for more than two hours without significant pain would be substantially limited in standing, since most people can stand for more than two hours without significant pain." *Id.*  "However, a person who can walk for ten miles continuously is not substantially limited in walking merely because on the eleventh mile, he or she begins to experience pain because most people would not be able to walk eleven miles without experiencing some discomfort." *Id.*

Plaintiff has not presented any admissible evidence about how his sarcoidosis limits him. Even crediting Plaintiff's deposition testimony that he cannot do "extrenuous [sic] walking" or continuous walking for one hour, courts have concluded that an inability "to do a substantial amount of walking . . ., while of course to an extent is limiting, does not rise to the level of a substantial limitation." *Mitchell v. Girl Scouts of the U.S.A.*, No. 98-CV-3730, 2003 WL 22705121, *6 (S.D.N.Y. Nov. 17, 2003) (collecting cases); *see also Cady v. Bolivar-Richburg Cent. Sch. Dist.*, No. 12-CV-01121V(F), 2016 WL 8291111, *7 (W.D.N.Y. Nov. 28, 2016) ("Plaintiff fails to point to any case in which the court held that a plaintiff's moderate limitation in her ability to walk or to climb stairs constitutes a 'disability' under the ADA, and the court's research has revealed none").

Because Plaintiff cannot establish as a matter of law or raise a dispute of fact as to whether he has a qualifying disability under the ADA, the Court must dismiss his ADA claim. The Court therefore grants Defendant's motion and denies Plaintiff's motion on this ground. In the alternative, even if Plaintiff had raised a question of fact as to whether he has a qualifying disability, he has not presented evidence sufficient to raise a question of fact concerning whether he was qualified for his position or whether he was a denied a reasonable accommodation.

### 2. Whether Plaintiff was Qualified for his Position or Denied a Reasonable Accommodation

"The text of the ADA tells us that only 'qualified individual[s]' can establish a disability discrimination claim." *Williams v. MTA Bus Co.*, 44 F.4th 115, 127-28 (2d Cir. 2022). "In section 12111(8), Congress defined 'qualified individual' for purposes of the ADA as 'an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Id.* (quoting 42 U.S.C. § 12111(8)). The ADA maintains a "requirement that the individual seeking protection under the antidiscrimination provisions be able to 'perform the essential functions of the employment position.'" *Id.* (quoting 42 U.S.C. §§ 12111(8), 12112(a)).

"The 'essential functions' of a position 'means the fundamental job duties of the employment position,' but does not include 'the marginal functions of the position.'" *Frantti v. New York*, 414 F. Supp. 3d 257, 286 (N.D.N.Y. 2019), *aff'd*, 850 Fed. Appx. 17 (2d Cir. 2021) (quoting *Atencio v. U.S. Postal Serv.*, 198 F. Supp. 3d 340, 356 (S.D.N.Y. 2016)). "'In determining whether a particular function is essential, courts consider, among other things, "[t]he employer's judgment as to which functions are essential," "[w]ritten job descriptions," and "[t]he amount of time spent on the job performing the function."'" *Id.* at 286-87 (quotations omitted);

*see also* 29 C.F.R. § 1630.2(n)(3)).  "'A court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position.'"  *Id.* (quotations omitted).  "'But ultimately, the question whether a task constitutes an essential function depends on the totality of the circumstances.'"  *Id.* (quotations omitted); *see also Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir. 2004); *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013) (quotations omitted) ("A court must avoid deciding cases based on 'unthinking reliance on intuition about the methods by which jobs are to be performed.' . . .  Instead, a court must conduct 'a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice'").

"When making a claim based on a failure to accommodate, 'the plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow him to perform the essential functions of his employment.'"  *Bey v. City of New York*, 999 F.3d 157, 165 (2d Cir. 2021) (quoting *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013)).  "Once a plaintiff 'suggests plausible accommodations, the burden of proof shifts to the defendant to demonstrate that such accommodations would present undue hardships and would therefore be unreasonable.'"  *Id.* (quoting *McMillan*, 711 F.3d at 128) (citations omitted).

As Plaintiff asserts, his job description is silent on the use of a respirator or need to walk for a continuous period of time.  *See* Dkt. No. 82-20 at 8-9.  It does, however, note that an operator "[m]ixes chemicals and fills water treatment tanks and monitors, regulates and adjusts chemical feed equipment to ensure the addition of proper dosages."  *Id.* at 8.  It also requires an operator to have "good knowledge of the materials, equipment and chemicals involved in operating and maintaining Wastewater Treatment Plant" and "good knowledge of federal, state and local laws and regulations applicable to Wastewater Treatment Plant."  *Id.*

Plaintiff created pie charts delineating a WWTPO's responsibilities.  *See* Dkt. No. 82-20 at

11-13.  In those charts, Plaintiff indicated that there is "[n]o Respirator usage on weekends,"

"Respirator Usage is only used during Chlorination Season which is April to October every year,"

and respirators require only "1% usage."  *Id.* at 11.  He also listed the tasks in which a respirator is

"required" as only when there are transfers of sodium bisulfite and sodium hypochlorite and when

the WWTPO is acting in the floater position.  *See id.* at 14.

Plaintiff's charts and contentions are not consistent with other evidence in the record,

including his own testimony.  For example, Plaintiff indicates that "regular operation" consists of

ten percent "Floc Pits: Decanting" but also states that Operators do not enter the "Floc Pits."  Dkt.

No. 82-20 at 11, 15.  During his deposition, Plaintiff explained that he was "in a floc building."

Dkt. No. 82-4 at 209.  In describing the operators' roles, he stated that they "take off the top of the

primary and secondary scum.  That's one thing the operator does.  The finals and the floc, both we

do. . . .  You stand and you pump out the scum pit and you pump out the floc pit and then you do

the same thing with the thickener."  *Id.* at 23.  As part of the opening job responsibilities, "[y]ou

have to check all of the floc pits there."  *Id.* at 26.  Plaintiff stated that, "[w]e pump down the floc

pits and that takes a good couple of hours because the pumps don't always want to work.  We

usually have to go down and open them up just like the thickener pump."  *Id.* at 47.

Plaintiff's inconsistencies are also evident in his representations related to walking.

Plaintiff repeatedly testified during his deposition that he could not continuously walk for one

hour.  *See* Dkt. No. 82-4 at 156-63.  In Plaintiff's correspondence with his supervisors and in the

documents he submitted with his administrative proceedings, Plaintiff never mentioned a

disability relating to walking.  *See* Dkt. No. 89-4 at 5-15, 26; Dkt. No. 89-5 at 9-10.  Plaintiff

testified to one walking situation where "[l]ike if you walked from the main building to the floc

pit back to the digester back to the floc pit back to the main building that's what I would call extrenuous [sic] because you're nonstop walking." *Id.* at 158.  Plaintiff affirmed that he "need[s] to be able to do an hour of walking six times a week to do [his] job as a wastewater treatment plant operator[.]" *Id.* at 163.

In response to Defendant's argument that Plaintiff would not be qualified for his job if he has the walking limitation, Plaintiff asserts that "the link between 'opening/closing' to continuously walking is totally 'Fictious' based on [the following] two facts." Dkt. No. 89-7 at 6. First, Defendant's counsel asked Plaintiff leading questions during his deposition.  *See id.* Second, as a self-proclaimed "expert witness," Plaintiff states that "an operator must stop 'periodically' to check monitors, pumps, gages, temps, pressures, and all other opening/closing duties – Not continuously walking." *Id.*

Ms. Böttger testified during her deposition that the ability to wear a respirator is an essential function of the WWTPO job "for safety" purposes.  Dkt. No. 82-16 at 21.  It is essential because of "fit testing and the ability to wear a respirator is part of an OSHA standard based on the type of operation at the wastewater treatment plant, and also given the nature of the operation, we have a small crew of people.  They don't work in teams.  Oftentimes they work in different parts of the plant, you know, on their own so it's important that they are wearing a respirator." *Id.* Mr. Mattice testified that "the OSHA guidelines, the requirements to enter a confined space or to transfer chemicals require the use of a respirator."  Dkt. No. 82-16 at 33.

As explained by Defendant in its memorandum of law, OSHA requires that "[e]mployers must limit an employee's exposure" to certain substances.  29 C.F.R. § 1926.55(a).  These substances include chlorine and methane which Plaintiff testified to being present at the plant and being transferred by the WWTPOs.  *See id.* at Table 1; *see also* Dkt. No. 82-4 at 25-26, 37, 219.

The regulation states that to achieve the goal of limiting employees' exposure, "administrative or engineering controls must first be implemented whenever feasible.  When such controls are not feasible to achieve full compliance, protective equipment or other protective measures shall be used to keep the exposure of employees to air contaminants within the limits prescribed in this section."  29 C.F.R. § 1926.55(b).

The letter from John J. May, M.D., from Bassett Medical Center Pulmonology and dated March 11, 2020, concerning Plaintiff's fitness examination is relied on by both parties.  The letter states, in full, that Plaintiff "is OK for return to customary activities at work.  He is NOT approved for use of a respirator.  Job activities requiring a respirator must be deferred to other workers."  Dkt. No. 89-2 at 49.

As for walking, Plaintiff repeatedly affirmed that his job required continuously walking.  See Dkt. No. 82-4 at 73-74, 155, 157-64.  He asserted that opening and closing each take one hour and during the weekend shift, he has to mop and sweep the floors.  *See* Dkt. No. 89-1 at ¶ 51; *see also* Dkt. No. 82-4 at 74.  In his response to Defendant's statement of material facts, Plaintiff asserts that a WWTPO's responsibilities include "more than just walking around the WWTP.[] An operator checks the main 'switch' board, checks for any errors, then the electrical room, the generator, and empties the influent rooms waste barrels."  Dkt. No. 89-1 at ¶ 63.  "Next, the operator proceeds to navigate thru [sic] the WWTP's buildings one at a time.  Periodically 'stopping' at different equipment/machinery (for minutes at a time) to check gages, dials, pressures, and temps."  *Id.*  Plaintiff's descriptions of his job did not include one reference to a task where he is sitting.  *See* Dkt. No. 82-4.

Although the need to use a respirator or walk for one hour is not listed in Plaintiff's job description, "[c]ourts 'must give considerable deference to an employer's judgment regarding what

functions are essential for service in a particular position[.]" *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 229 (2d Cir. 2017) (quoting *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003)).  Courts have found genuine disputes concerning the essential function inquiry where, for example, the employer testified that the function was minimal and he was unsure if it would be considered essential, *see Tafolla v. Heilig*, 80 F.4th 111, 119 (2d Cir. 2023), the employer had previously accommodated the request, *see Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 121 (2d Cir. 2004), or the employer did not consistently require all employees to perform the function at issue.  *See Presumey v. Town of Greenwich Bd. of Educ.*, No. 3:15-CV-278, 2018 WL 740194, *3 (D. Conn. Feb. 7, 2018), *aff'd sub nom. Presumey v. Bd. of Educ., Town of Greenwich*, 770 Fed. Appx. 595 (2d Cir. 2019).

Here, Defendant requires all employees to wear respirators when handling certain chemicals because it is OSHA mandated.  Defendant's supervisors testified that it was an essential function.  Plaintiff agreed that interacting with chemicals is a normal job requirement.  Defendant also requires each, of the only five employees, to work one weekend shift alone each month.  This requires continuously walking for approximately an hour.  Because Plaintiff has not presented any admissible evidence to demonstrate that he is qualified for his position related to the need to wear a respirator or continuously walk around the plant, summary judgment is warranted on this issue in Defendant's favor.

Moreover, even if Plaintiff is qualified for the position, his requests for accommodations are not reasonable.  In a letter to his employer, he stated "[t]he WWTP has five operators at any given time.  Chris Pelligra, Scott Burger, Jared Vagilardo, Micheal Nader, and Matthew Stevens. Time off shouldn't be an issue if I get symptomatic conditions during my employment with the City.  All operators do all the same jobs." Dkt. No. 82-11 at 2.  In response to Defendant's

motion, Plaintiff argues that his accommodation request was reasonable because he "requested to be excused from the 'Respirator' related tasks.  For the short time of (15-20 minutes) [he] would perform another important task in the WWTP.  While the maintenance and another operator perform the 'chemical transfers.'"  Dkt. No. 89-7 at 4.  Plaintiff argues that the chemical transfers occur twice a month for six months in the year which equates to six hours out of the year.  *See id.* Plaintiff contends that his responsibilities could be deferred to the other operators.  *See* Dkt. No. 89-1 at ¶ 47.  He also asserts that he should be permitted to leave work whenever he becomes short of breath.  *See* Dkt. No. 82-11 at 2.  Because of his medical restrictions, Plaintiff was absent from work for more than one year.  Dkt. No. 82-19 at 2.  In response to Defendant's argument that Plaintiff's sudden need to leave could render the plant inoperable, Plaintiff contends that the argument "has no reality in the real world."  Dkt. No. 89-7 at 6.  Plaintiff asserts that "[a] WWTP is 'automated' meaning, runs basically 'by itself.'  The operators are there to keep the 'train' on the tracks."  *Id.*  Plaintiff also argues in his motion that Defendant's illegality is demonstrated by Ms. Böttger's statement that Defendant does not have an obligation to create a light duty position.  *See* Dkt. No. 80 at 23.

However, Plaintiff agrees that he worked with only five people: four operators and one maintenance worker.  *See* Dkt. No. 89-7 at 2; Dkt. No. 82-4 at 20, 208.  He testified that there were "times when you're in one of the buildings completely by yourself."  Dkt. No. 82-4 at 51. He would also work half days every third Saturday and Sunday of the month by himself.  *See id.* at 36-37.

"'Courts have consistently ruled that "an employee cannot be considered otherwise qualified when she is unable to report to work at the time required, because she is not able to perform the essential functions of her job."'"  *Rinaldi v. Quality King Distributors, Inc.*, 29 F.

Supp. 3d 218, 227 (E.D.N.Y. 2014) (quoting *Lewis v. New York City Police Dep't*, 908 F. Supp.

2d 313, 327 (E.D.N.Y. 2012), *aff'd sub nom. Lewis v. NYC Police Dep't*, 537 Fed. Appx. 11 (2d

Cir. 2013)) (additional quotation and citations omitted).  An "accommodation [] to let [an

individual] work whenever she is able . . . is not what the law requires."  *Lewis*, 908 F. Supp. 2d at

328.  "Indeed, courts have specifically noted that '[t]he ADA does not require employers to

tolerate chronic absenteeism even when attendance problems are caused by an employee's

disability.'"  *Id.* (quoting *Mescall v. Marra*, 49 F. Supp. 2d 365, 374 n.18 (S.D.N.Y. 1999))

(collecting cases).

     "A change in shift can be a reasonable accommodation."  *Van Ever-Ford v. Off. of Mental*

*Health (Buffalo Psychiatric Ctr.)*, No. 13-CV-412, 2020 WL 5951334, *9 (W.D.N.Y. Oct. 8,

2020) (citing 42 U.S.C. § 12111(9) (defining "reasonable accommodation" as, among other

things, "job restructuring, part-time or modified work schedules[,] . . . and other similar

accommodations for individuals with disabilities")) (additional citations omitted); *see also Ray v.*

*Weit*, 708 Fed. Appx. 719, 721 (2d Cir. 2017) ("This Court has held that '[p]hysical presence at or

by a specific time is not, as a matter of law, an essential function of all employment.'  Thus,

reasonable accommodations can include a modified work schedule") (quotation omitted).

However, in the specific context of a wastewater treatment plant, courts have concluded that

"'[m]oving one operator to a straight day shift would place a heavier burden on the rest of the

operators in the plant.  And an accommodation that would result in other employees having to

work harder or longer is not required under the ADA.'"  *Mineweaser v. City of N. Tonawanda*,

No. 14-CV-00144, 2016 WL 3352046, *10 (W.D.N.Y. Mar. 21, 2016) (quoting *Turco v. Hoechst*

*Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996)) (collecting cases); *see also Borkowski v.*

*Valley Cent. Sch. Dist.*, 63 F.3d 131, 140 (2d Cir. 1995) ("[H]aving someone else do part of a job

may sometimes mean eliminating the essential functions of the job.  But at other times providing

an assistant to help with a job may be an accommodation that does not remove an essential

function of the job from the disabled employee").

Plaintiff requests to be able to leave work whenever needed, at potentially unscheduled

times, and have other employees handle any work that required the use of a respirator.  Further, if

he is unable to walk continuously for one hour, another employee would have to work Plaintiff's

weekend shift as there is only one employee working at that time.  These requests are not

reasonable as they eliminate essential functions of the job: handling certain chemicals in specific

ways and taking one weekend shift a month.  This conclusion is supported by the extremely

limited number of employees who would be reassigned to take over Plaintiff's tasks or shifts.  *See*

*Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 791 (S.D.N.Y. 2020) (quoting 29 C.F.R. §

1630.2(n)) ("The function may be essential because of the limited number of employees available

among whom the performance of that job function can be distributed").

Insofar as Plaintiff argues that Defendant not allowing for light work is illegal, "[t]o the

extent a light duty assignment would eliminate [] essential functions, it does not constitute a

reasonable accommodation under the ADA."  *Francis v. Wyckoff Heights Med. Ctr.*, 177 F. Supp.

3d 754, 774 (E.D.N.Y. 2016) (citing *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir.

2003); *McKnight v. Town of Hamburg*, No. 12-CV-1257, 2016 WL 11259014, *10 (W.D.N.Y.

Apr. 25, 2016) ("[T]he Town does not have permanent light duty positions; rather, under the

Light Duty Policy, an officer may temporarily work light duty upon showing that he can return to

full duty within six months. . . .  The Light Duty Policy is not a 100% healed policy because it

requires an officer to show that she can perform the essential functions required of a police

officer, not that she is completely healed"); *Kronstein v. Albany Cnty.*, No. 1:21-CV-00543, 2023

WL 6200279, *14 (N.D.N.Y. Sept. 22, 2023) (collecting cases) ("Courts have found that a material question of fact exists as to whether a defendant provided a reasonable accommodation where an employee produces evidence that there were long-term light duty positions available").

Throughout Plaintiff's submissions, he references a "100% Healed Policy." Dkt. No. 89-1 at ¶¶ 9, 12, 15, 19, 25, 30, 65, 71, 73, 75, 83, 85, 96, 98, 105, 110. Courts have concluded that an employer's policy requiring that an employee be 100% healed prior to returning to work violates the ADA. *See Kronstein v. Albany Cnty.*, No. 1:21-CV-00543, 2023 WL 6200279, *15 (N.D.N.Y. Sept. 22, 2023) (collecting cases); *see also Jacobson v. Cap. One Fin. Corp.*, No. 16-CV-06169, 2018 WL 6817064, *20 (S.D.N.Y. Dec. 12, 2018). However, "the ADA does not excuse poor performance or give disabled employees a free pass to perform substandard work. . . . [T]he ADA or the NYSHRL . . . do not require an employer to tolerate mistakes or substandard work from a disabled employee." *Jacobson*, 2018 WL 6817064, at *20. Plaintiff was absent from work for over one year. *See* Dkt. No. 82-19 at 2. "Where the medical leaves of absence stretch beyond a year, as here, courts have found that the employee, as a matter of law, cannot perform the essential functions of his position." *Micari v. Trans World Airlines, Inc.*, 43 F. Supp. 2d 275, 281 (E.D.N.Y.), *aff'd*, 205 F.3d 1323 (2d Cir. 1999) (collecting cases). "The ADA does not require employers to tolerate chronic absenteeism even when attendance problems are caused by an employee's disability." *Mescall v. Marra*, 49 F. Supp. 2d 365, 374 n.18; *see also Van Ever-Ford v. Off. of Mental Health (Buffalo Psychiatric Ctr.)*, No. 13-CV-412, 2020 WL 5951334, at *9 (W.D.N.Y. Oct. 8, 2020) ("'[T]here is a plethora of cases supporting the contention that excessive absenteeism eliminates an essential function of employment—attendance—and therefore such absenteeism does not constitute a reasonable accommodation as a matter of law'") (quotation and citations omitted); *Clark v. Coca-Cola Beverages Ne., Inc.*, No. 1:18-CV-1298,

2020 WL 6822982, *7 (N.D.N.Y. Nov. 20, 2020), *aff'd*, No. 20-4040-CV, 2022 WL 92060 (2d Cir. Jan. 10, 2022) ("[T]he record shows that Defendant's policy required an employee returning to work to be capable of 'full duty,' meaning only that he could perform the essential functions of the job, with or without reasonable accommodation.  Plaintiff's argument to the contrary is based on an entirely speculative interpretation equating 'full duty' with '100 percent healed,' a correlation that was repeatedly rejected by employees with personal knowledge").

Plaintiff does not present any admissible evidence that Defendant maintained a "100% healed" policy and Defendant was not required to create a light duty position for Plaintiff.  Based on the foregoing, Plaintiff has failed to establish a *prima facie* case of discrimination.  As such, summary judgment is warranted in Defendant's favor.[2]

### IV. CONCLUSION

After carefully reviewing the record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for summary judgment (Dkt. No. 80) is **DENIED**; and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 82) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

---

[2] Defendant also argues that it had a legitimate, nondiscriminatory purpose for terminating Plaintiff.  *See* Dkt. No. 82-28 at 15-17.  Because the Court concludes that Plaintiff was not disabled under the meaning of the ADA and has not raised a genuine dispute of fact concerning whether he was qualified for his position or was denied a reasonable accommodation, the Court declines to address this alternative ground for summary judgment.

40

**ORDERS** that the Clerk of the Court shall serve a copy of the Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  July 31, 2024
       Albany, New York

Mae A. D'Agostino
U.S. District Judge